**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **DR. PATRIZIA RICCARDI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:06cv0605** |
| | ) | |
| **VANDERBILT UNIVERSITY MEDICAL CENTER,** | ) | |
| **and DR. ROBERT KESSLER, and** | ) | |
| **DR. MARTIN SANDLER, individually,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Before the Court are two motions:  (1) the Motion for Summary Judgment filed by Defendants Vanderbilt University Medical Center ("Vanderbilt") and Dr. Martin Sandler ("Sandler") (Doc. No. 66), seeking judgment in their favor on all claims brought against them by Plaintiff Dr. Patrizia Riccardi, including claims against Vanderbilt for sexual harassment by a supervisor and retaliation in violation of Title VII and § 4-21-301 of the Tennessee Human Rights Act, Tenn. Code Ann. ("THRA"), and against Sandler individually for retaliation in violation of the THRA; and (2) the Motion for Partial Summary Judgment (Doc. No. 75) by Defendant Dr. Robert Kessler ("Kessler"), seeking summary judgment as to the THRA retaliation claim asserted against him individually.[1]  This Court's jurisdiction is premised upon the federal questions presented as well as the complete diversity among the parties.

The motions have been fully briefed and are ripe for consideration.  For the reasons set forth below, the Court finds that Vanderbilt's and Sandler's motion should be granted in part and denied in part. Specifically, the motion for summary judgment as to the sexual harassment and retaliation claims against Vanderbilt will be denied, but the motion for summary judgment as to the THRA retaliation claim against Sandler will be granted and that claim dismissed.  Kessler's motion for partial summary judgment will be denied.

---

[1]Plaintiff also asserts state law claims against Kessler individually for "personal injury/battery" and intentional infliction of emotional distress.  Those claims are not addressed in Kessler's motion.

## I.      STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties."  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th Ed.1979)); other citations omitted).  The Court must view the evidence in a light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210–11 (6th Cir. 1984).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The initial burden on the movant is not as formidable as some decisions have indicated.  The moving party need not produce evidence showing the absence of a genuine issue of material fact; rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.  Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue.  Fed. R. Civ. P. 56(e); *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986).

To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue.  As the United States Supreme Court has stated, "[t]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted).  The standard for summary judgment mirrors the standard for a directed verdict under Rule 50(a).  *Anderson*, 477 U.S. at 250.  Consequently, a nonmovant must do more than raise some doubt as

to the existence of a fact; the nonmovant must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact.

## II.     FACTUAL BACKGROUND

### A.     The Parties

Vanderbilt is a private, not-for-profit corporation organized under Tennessee law.  It is divided into various schools and colleges including the School of Medicine.  The School of Medicine is further divided into various departments, including the Department of Radiology and Radiological Sciences ("Radiology Department").   Within departments there are also divisions of more specialized concentrations. Physicians employed by Vanderbilt are frequently appointed to both faculty and to clinical positions in which they see patients.  Some faculty members concentrate on research and others divide their time between research and clinical care.  At all times relevant to Plaintiff's claims, the Dean of the School of Medicine was Steven Gabbe, M.D.

The Radiology Department includes both physicians and basic scientists who hold non-medical degrees in fields such as physics.  A significant number of the physicians in the Radiology Department are engaged in various research activities that are funded through grants awarded by the National Institutes of Health ("NIH") and other organizations.  Members of the Radiology Department faculty are expected to obtain funding from research grants to support a significant portion of their salary.  Generally, all non-tenured research faculty are expected to obtain support for at least 75% of their salary from outside funding sources within three years of being appointed to the faculty.

Defendant Dr. Martin Sandler has been employed by Vanderbilt as a member of the faculty of the School of Medicine since 1983.  At all times relevant to this dispute, he was Chairman of the Radiology Department and Defendant Dr. Robert Kessler's direct supervisor.  Sandler was promoted to the position of Associate Vice Chancellor for Hospital Affairs in July 2006.

Defendant Kessler was initially appointed to the faculty of the School of Medicine in the Radiology Department in 1984 as Associate Professor with tenure.  He was promoted to the position of full professor within several years, and in August 2004 was named to the Roentgen Chair of the Radiology and Radiological Sciences.  He is a renowned scholar with a lengthy list of publications; he was responsible for the design and start-up of Vanderbilt's Positron Emission Tomography ("PET") Center and is the

Director of Vanderbilt's Center for Molecular Imaging. In 2003, Kessler was awarded a substantial, multi-year research grant by the NIH to conduct research into certain brain functions affecting schizophrenia, drug abuse, attention deficit disorder, depression and other mental disorders utilizing a radioactive "marker" known as [18F]fallypride and PET technology (the "AMPT Grant").

Plaintiff Dr. Patrizia Riccardi is a medical doctor in the field of psychiatry who is currently employed by Vanderbilt as a Research Assistant Professor in the Center for Molecular Imaging within the Radiology Department. Plaintiff is an Italian citizen who received her medical education and training primarily in Italy. She moved to the United States in 1995 and, prior to coming to Vanderbilt, had accepted a fellowship at Yale University Medical School.

Plaintiff's affiliation with Vanderbilt began when she applied for and accepted an appointment as a Research Fellow in the Radiology Department at Vanderbilt beginning in September 2003. Abandoning her fellowship at Yale, Plaintiff accepted the fellowship at Vanderbilt in a part-time (50% effort) position at a salary of $58,000 per year, as Plaintiff planned to continue to spend most of her time in New York and Connecticut, where she conducted a clinical practice, and only the last ten days of each month in Nashville. Plaintiff asserts that the major reason she came to Vanderbilt was that she believed she could obtain valuable experience training with Kessler, who was one of the few scientists in the United States who specializes in the field she wished to pursue, PET. Plaintiff asserts she was recruited specifically to work with Kessler on his AMPT Grant and other work involving PET technology. There is no dispute that Plaintiff and Kessler worked closely together from September 2003 through June 2005, during which time Kessler functioned as Plaintiff's mentor and advisor as well as her direct supervisor.

Plaintiff completed her fellowship at Vanderbilt in the spring or summer of 2004 and accepted a one-year term position as Research Assistant Professor in the Radiology Department, without tenure, effective July 1, 2004 through June 30, 2005. Her appointment was for a 50% effort, referred to as "full-time, partial-load status," which made her eligible for full faculty benefits, and her initial salary in that position was $65,000. From the outset, however, the terms of Plaintiff's employment required that she become 75% funded within a three-year period of her faculty appointment, or by July 1, 2007, in order to ensure renewal of her contract. Plaintiff has known since her initial employment that her faculty appointment would likely not continue to be renewed after that date unless she was able to fund 75% of

her own salary through outside sources by then. One potential source of outside funding was to obtain her own grants to pay a portion of her salary, or to contribute to other faculty members' grants, which would also pay a portion of her salary.

After completion of her fellowship and beginning work as assistant professor, Plaintiff continued to work in Nashville only ten days per month. She was reappointed to the same position, under the same terms, for two subsequent one-year periods, from July 1, 2005 through June 30, 2006 and from July 1, 2006 through June 30, 2007. She was recently reappointed on the same terms for the period from July 1, 2007 through December 31, 2007, even though Plaintiff has not succeeded in obtaining 75% funding of her salary.[2]

### B.    Plaintiff's Relationship with Kessler

Plaintiff's primary job duties at Vanderbilt from 2003 through June 2005 involved working with Kessler on the AMPT Grant. Plaintiff also asserts she was expected to work exclusively with Kessler on his grants and was recruited by Kessler for this purpose, and that Kessler was expected to contribute to her grant work as well, both because he was her mentor and supervisor and because he was the only scientist at Vanderbilt specializing in PET who could assist with her grant work.

She alleges that Kessler began sexually harassing her and subjecting her to a severe and pervasive hostile working environment in November 2003. The parties do not dispute, for purposes of the Defendants' motions, that there is a material question of fact as to whether Kessler sexually harassed the Plaintiff and as to whether the alleged harassment was sufficiently severe and pervasive to support a *prima facie* case under Title VII or the THRA, as discussed below. Plaintiff claims she did not initially report her alleged problems with Kessler because he is a renowned expert in the field of neuroimaging

---

[2]Plaintiff only submitted one grant herself prior to June 2005, which was not funded, and none of the grant proposals she has submitted since June 2005 have been funded either. Nonetheless, Plaintiff received a letter dated May 3, 2007 from Steven G. Gabbe, M.D., Dean of the Medical School, notifying her that he had approved an extension of her current appointment based upon the recommendation of Dr. Jeremy Kaye, who succeeded Sandler as Chair of the Radiology Department in July 2006. (Doc. No. 73-2, at 1; Doc. No. 69, at ¶2.) Plaintiff had previously received a letter from Dr. Kaye dated February 26, 2007 reminding her that reappointment to the Radiology faculty for fiscal-year 2007 was contingent on her obtaining 75% funding of her salary from outside sources, including grants, which she had not done. Dr. Kaye nonetheless recommended extending her appointment an additional six months based upon the fact that she had a grant application pending at that time, her work on the AMPT grant had been extended until July 31, 2007, and she had two manuscripts in preparation for publication. (Doc. No. 93-15.) The extension was ostensibly intended to give her time to complete work on pending projects, to continue seeking grant funding and, alternatively, to seek employment elsewhere. (*Id.*)

while she was just beginning her career in that field, and she was aware that he had the "power and influence to destroy her career at Vanderbilt or anywhere else." (Doc. No. 93, Affidavit of Dr. Patrizia Riccardi ("Riccardi Aff.") ¶ 20.) According to Plaintiff, her work schedule was adversely affected by Kessler's harassing behavior in that she had to work longer hours to complete her work because Kessler would distract her, and she eventually changed her schedule to work later hours in an effort to avoid him.

Kessler, on the other hand, denies engaging in any sexually harassing behavior and instead contends that he and Plaintiff conducted a consensual sexual relationship that began in January or February 2004. (Plaintiff denies ever having sexual relations with Kessler.)

In November 2004, Kessler called Defendant Sandler, then Chair of the Radiology Department, late one evening to report that he had been having an affair with Plaintiff for approximately a year and that they had had a bad break-up. He met with Sandler the next morning and relayed to him more details about the alleged affair, and reported that it had ended badly after he had told Plaintiff that he would not divorce his wife and that he and Plaintiff needed to end their relationship. According to Kessler, Plaintiff became very upset about this and physically attacked him. Kessler showed Sandler what he alleged to be bruises and large bite mark on his forearm inflicted by Plaintiff. Kessler also assured Sandler that the affair was over, that it would not happen again, and that he felt that he and Plaintiff could disengage their relationship and continue to collaborate effectively as colleagues. Finally, Kessler relayed to Sandler that Plaintiff did not want Sandler to discuss the issue with her since she was embarrassed about it and felt it would make it difficult for her to continue to work in the Radiology Department.

Sandler has testified that, based on his long-standing relationship with Kessler, he had no reason not to believe Kessler. Based on Kessler's representations that the relationship was over, Sandler decided not to take the matter to the Dean or to confront Plaintiff about it. He told Kessler, however, that he would watch the two of them closely and, if the relationship resumed, he would have no choice but inform the Dean about the affair.

Sandler also testified that, while the Vanderbilt Faculty Manual addresses the impropriety of sexual relationships between faculty members and students, it does not expressly address the issue of consensual relationships between faculty members or between faculty members and fellows, who are neither faculty nor students. Moreover, although Plaintiff had been a fellow when the relationship

commenced, Plaintiff was a atypical in that she was in her late 40s at the time, a board-certified Psychiatrist and had been a practicing physician for approximately twenty years before coming to Vanderbilt. Thus, Sandler maintains that nothing in the Faculty Manual required that he advise anyone outside the Radiology Department of the relationship between Kessler and Plaintiff, as reported to him by Kessler, despite the fact that both Sandler and the Vanderbilt community generally regarded a consensual relationship between a senior faculty member and a fellow or junior faculty member as inappropriate. In any event, as a result of Sandler's decision, Plaintiff did not become aware that Kessler had (falsely, according to her) reported the existence of a sexual relationship to Sandler until sometime during the course of this lawsuit.

Plaintiff met with Sandler in early December 2004, shortly after Kessler reported the alleged relationship and bad break-up to him. The initial purpose of the meeting was to discuss a dispute Plaintiff had had with Kessler regarding the submission of a grant proposal. That issue was resolved prior to the meeting, so instead Plaintiff asked Sandler for more departmental assistance with her own grant proposals. Plaintiff did not bring up any problems concerning the alleged sexual harassment by Kessler, nor did Sandler bring up the issue of the alleged consensual sexual relationship and physical assault.

According to Sandler, he saw Plaintiff and Kessler together two or three times between November 2004 and June 2005 and "they seemed to be doing fine together." (Doc. No. 72, Affidavit of Martin P. Sandler ("Sandler Aff.") ¶ 14.)

In May 2005, Kessler reported to Sandler another alleged incident that occurred between him and Plaintiff. This time, according to Kessler, Plaintiff accompanied him to an optician's office to look at some new eyeglass frames. He alleged that she became angry, and physically violent, because Kessler selected the frames his wife preferred rather than those that Plaintiff preferred. Plaintiff denies this incident ever occurred.

### C. The Toronto Incident

In June 2005, both Plaintiff and Kessler (as well as Sandler and other Vanderbilt faculty from the Radiology Department) attended a professional conference in Toronto, Ontario. Although Plaintiff and Kessler traveled to Toronto together, Plaintiff ensured that they stayed at different hotels. Kessler nonetheless helped her rehearse for her two presentations to be given at the conference. After the

presentations were given successfully, Plaintiff and Kessler went out to a celebratory dinner at the restaurant at the Four Seasons Hotel where Kessler was staying.

Prior to the dinner, Kessler persuaded Plaintiff to leave her valuables in his hotel room, as her hotel room did not have a safe. After dinner, Plaintiff went to Kessler's room to retrieve her belongings. Plaintiff alleges that once they were in the room, Kessler attacked her physically and attempted to rape her. Plaintiff successfully defended herself but threatened to call the police and report the assault. She claims Kessler threatened to ruin her career if she reported him. Kessler denies that he attacked Plaintiff and instead claims that they had consensual sexual relations, at her invitation; he alleges that after intercourse, he expressed remorse and told Plaintiff that they could not start seeing each other again, at which point Plaintiff became violent and also threatened to ruin Kessler's career.

The undisputed facts are that Plaintiff called Kessler's wife that night after the altercation, although the content of that phone conversation is not in the record, and Kessler drove Plaintiff back to her hotel. Later, Kessler called the Toronto police and reported that Plaintiff had assaulted him. As a result, the Toronto police went to Plaintiff's hotel room and arrested her. She reported that she was the victim rather than the perpetrator of the assault, so the Toronto police arrested Kessler as well. Both parties were held in jail for a day and a night, and then released when the authorities decided there was not enough evidence to determine which party was the aggressor and which the victim, so the charges against them were dropped.

### D. Plaintiff's Allegations of Harassment and the ODC Investigation

Before she even left Toronto, Plaintiff called Anita Jenious, Associate Director of the Vanderbilt Opportunity Development Center ("ODC"), to report Kessler's alleged sexual harassment as well as the alleged assault. Shortly after returning to Nashville, on June 24, 2005, Plaintiff had a meeting with Jenious in person to lodge a formal complaint against Kessler. Plaintiff sent Jenious a follow-up e-mail the next day asking whether there was anything else she needed to do to prevent Kessler from continuing to harm her. Jenious began her investigation into Plaintiff's claims immediately after the June 24 meeting and concluded the investigation in December 2005.

Ultimately, on the basis of the information obtained during the course of her investigation, Jenious decided that there was insufficient evidence to support Plaintiff's claims of sexual harassment and

assault, but found based upon Kessler's admission that Plaintiff and Kessler had conducted a consensual sexual relationship. Because Kessler was Plaintiff's supervisor and mentor at the time, Kessler's behavior was determined to be unprofessional, inappropriate, and in violation of the standards of conduct set forth in the Vanderbilt Faculty Manual. Based upon Jenious's findings and the recommendations of a specially appointed faculty committee, Vanderbilt disciplined Kessler in the form of a reprimand, encouragement to continue receiving counseling, and a requirement that he reimburse Vanderbilt for certain out-of-pocket expenses, including attorneys' fees, arising out of or in connection with his unacceptable conduct with Plaintiff that led to the litigation being filed against the University, up to a maximum of $325,000. He was also advised that any future misconduct including inappropriate relationships with employees or trainees under his supervision would constitute grounds for dismissal. Finally, Kessler was instructed to have no direct communication with Plaintiff, to avoid being alone with her in the workplace, and to avoid saying anything that could be considered retaliation against Plaintiff in the advancement of her career at Vanderbilt or elsewhere.

### E. Plaintiff's Allegations of Retaliation

Plaintiff maintains that the ODC investigation was biased. Specifically, she alleges that (1) Jenious contacted all of Kessler's witnesses (four) and only one of Plaintiff's even though Plaintiff provided Jenious with a thirty-six page narrative account of her working relationship with Kessler and the alleged harassment, in which she identified eight different witnesses; (2) Jenious never gave her the opportunity to rebut Kessler's or his witnesses' allegations; and (3) Jenious lied to justify her conclusions when she stated to the special investigation Committee that Plaintiff had only ever identified one witness, and when she stated that Plaintiff essentially stopped communicating and cooperating with her early in the investigation process.

Plaintiff also alleges that Sandler impeded the ODC investigation and exerted his influence to ensure that Kessler was favored in the investigation. In support of this allegation, Plaintiff points to Anita Jenious's deposition testimony in which she was asked to explain some handwritten notes she took when she interviewed Sandler on June 28, 2005. According to those notes, Sandler told her that he needed Kessler to work. Asked to elaborate, Jenious stated:

> I had asked about the possibility of separating them, of removing either Dr. Kessler or Dr. Riccardi from being in close physical proximity as far as work, et cetera. If need be,

having Kessler removed from the work situation, et cetera. And Dr. Sandler explained to me the work that Dr. Kessler was doing – that he was a productive senior faculty member. That through his grants and work, he brought in a lot of revenue to the department. He needed him to work.

(Jenious Dep. at 202:10 – 203:4.) Plaintiff further asserts that Jenious "admitted that the fact that Dr. Kessler stood to lose his job affected the outcome of her investigation" (Doc. No. 107, at 17), but the deposition testimony to which she cites does not support the inference she is attempting to establish here. Jenious did state that "the fact that Dr. Kessler stood to lose a lot influence[d] her in believing that what he was saying was true." (Jenious Dep. at 126:7–10.) The context of the statement, however, as well as Jenious's testimony elsewhere, make it clear that she meant that the fact that Kessler admitted he had an inappropriate sexual relationship with a subordinate, given that he was married and stood to lose so much in making that admission, influenced her to believe he was likely telling the truth.

On June 29, 2005, just a few days after Plaintiff first met with Jenious to make a formal complaint of sexual harassment, Plaintiff and her attorney, David Raybin, met with several Vanderbilt representatives to discuss her allegations. Prior to the meeting, Raybin had advised Vanderbilt that Plaintiff did not want to be in Kessler's presence, so Kessler did not attend the meeting and as a result was not immediately aware of the decisions reached during the meeting. While there are almost as many versions of what transpired at the meeting as there are persons who attended it, it is clear that Vanderbilt was trying to figure out a way for Plaintiff and Kessler both to continue working at Vanderbilt without having to come into contact with each other, at least until the ODC investigation was concluded. Sandler announced his decision at that meeting that work on the AMPT Grant would be temporarily suspended for both Plaintiff and Kessler. Later, it turned out that work on the Grant had to be suspended because of the temporary unavailability of [18F]fallypride, the radioactive marker used in conducting the PET scans. Plaintiff does not dispute that neither she nor Kessler performed any work on the AMPT Grant after June 29, 2005 until January or February 2006, when [18F]fallypride became available again. She likewise does not dispute that Kessler had no input in the decision to suspend work on the Grant.

Plaintiff alleges that she was told at the meeting that she could not work with Kessler while the ODC investigation was pending and that Vanderbilt did not want her to come into contact with Kessler at all. She was therefore allegedly told to stay away from her office and the PET lab until the investigation was complete, although there was no discussion about prohibiting Kessler from using his office or the

PET lab. Vanderbilt denies that Plaintiff was ever told that she should stay away from her office and contends that the evidence in the record to which Plaintiff points in support of that allegation is either inadmissible hearsay or does not actually support the claim. In any event, there is no dispute that Plaintiff and Kessler inadvertently ran into each other in the PET lab shortly after the June 29 meeting, and that Plaintiff thereafter fled the campus The next day, she left town on a previously scheduled trip. Plaintiff returned to Vanderbilt around August 20 and does not allege that she was still denied access to her office at that point or any time thereafter.

Shortly before Plaintiff returned to Nashville on August 20, 2005, her attorney sent a letter to one of Vanderbilt's attorneys informing him that Plaintiff intended to return to Vanderbilt "in approximately ten days to continue her work" and that, although she understood that work on the AMPT Grant was suspended, "she ha[d] other matters she [could] work on and [would] use this interval to plan these projects with others." (Doc. No. 74-16, Deposition of David Raybin ("Raybin Dep.") at 31–32 & Ex. 1.) Plaintiff nonetheless claims that because 90% of her work before June 2005 was with Kessler on the AMPT Grant, she was basically unable to work even after she returned to Vanderbilt in late August.

In October 2005, Plaintiff sent an e-mail message to Sandler asking for some assistance with a grant proposal she was preparing to submit to the NIH. The proposal was a resubmission of a "Sex Differences" grant proposal Plaintiff had previously submitted in January or February 2005, with Kessler named as co-investigator, but which had not been funded. On October 24, 2005, Sandler and Dr. James Patton, Professor and Vice Chair for Finance and Administration, Radiology Department, both met separately with Kessler and Plaintiff to discuss Plaintiff's need for assistance and how the two of them could resume collaboration on various grant proposals and other work without the need for direct contact. Sandler proposed that Plaintiff and Kessler could communicate with each other via e-mail using Patton as an intermediary, which Plaintiff found acceptable. (Later, the parties decided to e-mail each other directly through new e-mail accounts, with copies to both their attorneys.)

In her meeting with Sandler and Patton, Plaintiff also communicated her desire to resubmit her Gender Differences grant proposal on November 1, 2005 and asked for permission to list Kessler as co-investigator on that grant, as he was on the first submission of the same proposal. Plaintiff told Sandler and Patton that she needed Kessler's assistance in reviewing the grant application before resubmitting it

and in particular needed his help writing the rebuttal letter addressing the specific concerns outlined by the reviewers of the original grant submission. Plaintiff asserts that Kessler's assistance with the resubmission of the grant proposal was critical because she had been informed by the NIH that without the support of Kessler or someone of his expertise, her chances of having the grant funded were not good. In addition, she had never resubmitted a grant before and needed guidance on how to address the reviewers' concerns with the original proposal. Finally, Plaintiff requested assistance with statistical analysis to support the proposal. Sandler and Patton agreed to speak to Kessler and also to contact someone in the Biostatistics Department on Plaintiff's behalf regarding help with the statistical analysis.

That same day, after being contacted by Sandler and/or Patton, Kessler agreed to be listed as co-investigator on the grant resubmission, but he did not agree to assist with the grant resubmission because he was scheduled to leave town the next day. He did, however, recommend someone in the Biostatistics Department who would be familiar with the type of analysis Plaintiff needed and might be able to help her. Patton and Sandler both contacted the Biostatistics Department that day. Patton testified that he made arrangements with someone on the Biostatistics faculty to provide Plaintiff some assistance but asserts that he never heard back from Plaintiff. Plaintiff claims she was told by the Biostatistics Department that no one was available to assist her given the short notice and the November 1, 2005 deadline. Plaintiff therefore resubmitted her grant proposal naming Kessler as co-investigator but without his input and without any assistance with the statistical analysis. She alleges that Patton and Sandler knew she needed help and that Kessler would not provide the requested assistance, but did not offer her assistance from anyone else at Vanderbilt.

Plaintiff resubmitted the Sex-Differences Grant proposal again, this time to the NIH, in October 2006. Kessler again agreed to serve as co-investigator on the grant. Plaintiff alleges, however, that "his comments were not meaningful and were provided at the last minute so that it was impossible for Plaintiff to incorporate any of his suggestions into the proposal." (Doc. No. 107, at 34.)

In February 2006, Plaintiff submitted a grant to the NIH titled "Imaging of Dopamine Release in Borderline Personality Disorder" (the "BPD Grant proposal"). She claims that Kessler refused to assist her with this grant in any way, despite having agreed in March 2005 to serve as co-investigator on the grant proposal. She alleges that Kessler was listed on the original application and he reviewed it in April

2005 and provided comments and suggestions at that time, and even offered to allocate money from his other grants to fund two or three scans so that she would have pilot data to support the BPD Grant proposal. (Riccardi Aff. ¶¶ 67, 68, and Ex. 5.) Plaintiff decided for strategic reasons to wait to submit the grant proposal, and planned to submit it in February 2006 instead.

In a letter dated January 24, 2006, Kessler's attorney informed both Vanderbilt's and Plaintiff's representatives that Kessler was not willing to serve as co-investigator on the BPD Grant and that he was under no obligation to do so. Plaintiff asserts that Vanderbilt "acquiesced" to Kessler's refusal to assist her despite the fact that Kessler was the only faculty member at Vanderbilt with the relevant background in PET neuroimaging who could assist her and serve as co-investigator on the grant. Plaintiff alleges she submitted the BPD grant proposal without Kessler's assistance.

Kessler did agree to serve as co-investigator on a grant proposal concerning autism that Plaintiff submitted to the NIH in June 2006. While he also agreed to review the grant and provide comments prior to its submission, Plaintiff complains that his comments were not comprehensive or meaningful.

Plaintiff submitted a proposal for a Vanderbilt Discovery Grant, also on autism, in August 2006. Kessler agreed to assist her with that grant proposal and specifically expressed an interest in "help[ing] in the composition and editing of this application so that, as much as possible, the grant application is clear and compelling." (Doc. No. 82-2, at 2.) By the time he agreed to assist her, however, Plaintiff had already submitted the grant proposal. She alleges that his refusal to promptly agree to help was retaliatory.

Kessler refused to be a Mentor/Sponsor on a NARSAD Young Investigators grant proposal Plaintiff submitted in July 2007. Plaintiff claims Vanderbilt was aware of Kessler's refusal and made an offer to attempt to locate another mentor for the grant but, Plaintiff claims, the offer was disingenuous because there is no one at Vanderbilt other than Kessler who has expertise in the type of research Plaintiff wishes to pursue. From the record, it appears that Plaintiff submitted the grant proposal without Kessler's participation but with a different Vanderbilt faculty member named as her Mentor/Sponsor.

The record does not reflect whether the NARSAD grant proposal was accepted for funding, but it is undisputed that none of Plaintiff's other grant proposals to date has been accepted for funding.

Plaintiff also complains that since June 2005 Kessler has submitted three new grant proposals on which he did not include her as a co-investigator, despite the fact that Plaintiff was allegedly included on all of Kessler's grant proposals involving PET technology submitted after she arrived at Vanderbilt and up until June 2005. She claims that Kessler's failure to include her as co-investigator on these grant proposals was retaliatory.

In general, Plaintiff alleges that because Kessler has failed to support her grants or to include her on his own grant work, she has not obtained sufficient outside funding to enable her to remain on the Vanderbilt faculty. She alleges that Kessler's actions were retaliatory and either constituted or resulted in an adverse employment action. She alleges that Vanderbilt and Sandler also retaliated against her for reporting sexual harassment by not sufficiently supporting her grant work and by acquiescing in Kessler's decisions.

## III.    ANALYSIS AND DISCUSSION

### A.    Plaintiff's Sexual Harassment Claim Against Vanderbilt

#### (1)    Applicable Legal Standards

Plaintiff asserts sexual harassment/hostile work environment claims against Vanderbilt under Title VII and the Tennessee Human Rights Act ("THRA"). The standards for determining the viability of such claims as a matter of law are the same under both statutes, *Parker v. Warren County Util. Dist.*, 2 S.W.3d 170, 176 (Tenn. 1999) (adopting the standards set forth in *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)).

An employee alleging a hostile work environment based on sexual harassment must show that: (1) the employee was a member of a protected class; (2) the employee was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile working environment; and (5) a basis exists for imposing liability on the employer. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).

A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted). Both an objective and subjective test must be

met; in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to a reasonable person and the actual victim. *Id.* at 21–22.

Analysis of the fifth element of the five-part showing, employer liability, differs depending upon the identity of the alleged harasser, with a distinction drawn between co-worker harassment and harassment perpetrated by a supervisor. *Nievaard v. City of Ann Arbor*, 124 Fed. Appx. 948, 953 (6th Cir. March 7, 2005). If the harassment was perpetrated by a supervisor and resulted in a "tangible employment action," the employer will be strictly liable. *Ellerth*, 524 U.S. at 762–63; *Keeton v. Flying J, Inc.*, 429 F.3d 259, 262 (6th Cir. 2005). If, however, no tangible employment action is taken,

> a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. . . . The defense comprises two necessary elements:  (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 777–78 (employing identical language).

In the case at bar, Plaintiff asserts both that she suffered a tangible employment action and that material factual disputes preclude summary judgment for Vanderbilt on the grounds of the *Ellerth/Faragher* defense.

### *(2)* *Whether Plaintiff Was Subject to a "Tangible Employment Action"*

According to the Supreme Court, a tangible employment action is "the means by which the supervisor brings the official power of the enterprise to bear on subordinates." *Ellerth*, 524 U.S. at 762. Thus, a tangible employment action "requires an official act of the enterprise, a company act." *Id.* The action must be *materially* adverse to warrant imposition of strict liability; thus, generally speaking, the action involves "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Keeton*, 429 F.3d at 262. In this case, the actions to which Plaintiff points do not support her claim that she suffered a materially adverse "tangible employment action."

First, she argues that Kessler falsely reported to Sandler that Kessler and Plaintiff had been conducting a consensual sexual affair and that Plaintiff had physically assaulted him, and that these allegations had the effect of impugning her and damaging her reputation. While it is certainly possible that Kessler's reports may have somewhat diminished Sandler's respect for Plaintiff, her allegations in

that regard are purely speculative. Moreover, she has not shown that this hypothetical diminishment of her reputation resulted in a tangible or material employment action against her in the sense of an official act by Vanderbilt itself.[3]

Otherwise, Plaintiff argues only that the Defendants' allegedly retaliatory conduct, which by definition could only have begun after she reported sexual harassment, in itself constituted a tangible employment action. According to Plaintiff's own allegations, however, the allegedly adverse actions resulted not from the harassment itself but from Plaintiff's act of reporting the harassment. As a matter of law, allegations of retaliatory conduct are not sufficient to state a claim that the alleged sexual harassment itself resulted in an adverse employment action. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790–91 (6th Cir. 2000) (holding that conduct alleged to have occurred in retaliation for complaints made about a hostile work environment cannot be figured into "the hostile working environment equation," because such incidents are not alleged to have occurred "because of sex").

Because Plaintiff has not presented evidence that she suffered a tangible employment action as a result of the alleged sexual harassment/hostile work environment, Vanderbilt is entitled to raise the *Ellerth/Faragher* affirmative defense.

### (3)     *Whether Vanderbilt is Entitled to Summary Judgment on the Basis of the Ellerth/Faragher Defense*

Again, Vanderbilt does not contest for purposes of this motion for summary judgment that Plaintiff suffered severe and pervasive sexual harassment. It does contend, however, that it is entitled to summary judgment on the basis that the undisputed facts demonstrate that Vanderbilt exercised reasonable care to prevent and correct promptly any sexually harassing behavior *and* that Plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities provided by Vanderbilt or otherwise to avoid harm. *Cf. Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807.

In support of its motion, Vanderbilt focuses on the institutional efforts it has undertaken to prevent and correct workplace discrimination and sexual harassment, and points out that Plaintiff was admittedly aware of the resources available to her and failed to take advantage of them until after the Toronto

---

[3]While damage to reputation that might harm future employment prospects may well constitute an adverse employment action sufficient to support a *prima facie* claim of *discrimination* under Title VII, *see Hillig v. Rumsfeld*, 381 F.3d 1028, 1038 (10th Cir. 2004), Plaintiff has not pointed to any case law suggesting that damage to reputation alone would warrant barring an employer from presenting an affirmative defense against a hostile work environment claim.

incident occurred. Plaintiff, for her part, does not attempt to justify her failure to report Kessler's alleged harassment until June 2005. Instead, she points out that Kessler reported to Sandler, his supervisor, in the fall of 2004 that Kessler and Plaintiff had been conducting a consensual sexual relationship and that Plaintiff had physically assaulted him when he ended it. While Plaintiff cannot refute Sandler's testimony that he had known Kessler for many years at the time Kessler reported the relationship with Plaintiff to him and that he had no reason not to believe Kessler's version of events, she argues that as a result of Kessler's false report, Sandler—and therefore Vanderbilt—had reason to believe that Kessler had conducted an inappropriate sexual relationship with a subordinate, which gave rise to an affirmative obligation on Sandler's part to discuss the issue with Plaintiff. Plaintiff further argues that if Sandler had confronted her at that time, he would have learned that she denied the existence of a sexual relationship and in fact believed that Kessler had been harassing her. At that point, she argues, Kessler's behavior could have been promptly corrected, and additional harassment and likely the assault that occurred in June 2005 could have been prevented.

Although Plaintiff's contentions regarding what might have happened if Sandler had questioned her about her relationship with Kessler are largely speculative, the Court nonetheless finds that a jury question is presented regarding the reasonableness of Sandler's actions, or failure to act, in response to Kessler's report. The issue, as framed by the Supreme Court in both *Faragher* and *Ellerth*, is the employer's "reasonable care." *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807. In this case, a jury might conceivably conclude that Sandler, as both Kessler's and Plaintiff's supervisor, had an obligation to ensure the welfare of Plaintiff, as the more subordinate employee, and that he was unreasonable in failing either to convey Kessler's report to the Dean or to confront Plaintiff about it. For that reason, Vanderbilt's motion for summary judgment as to the hostile work environment/sexual harassment claim against it must be denied.

      **B.**      **The Retaliation Claims Against Vanderbilt**

            *(1)*      *Applicable Legal Standards*

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made unlawful by [42 U.S.C. § 2000e], or because he has made a charge, testified, assisted, or participated in

any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. §2000e-3(a).

Similarly, under the THRA:

> It is a discriminatory practice for a person or for two (2) or more persons to:
>
> (1) Retaliate or discriminate in any manner against a person because such person has opposed a practice declared discriminatory by this chapter or because such person has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing under this chapter. . . .

Tenn. Code Ann. § 4-21-301. A retaliation claim, like a disparate treatment case, can be proved either through direct evidence or through indirect evidence, using the *McDonnell-Douglas* burden-shifting approach. *See Christopher v. Strouder Mem'l Hosp.*, 936 F.2d 870, 879 (6th Cir. 1991) (considering direct and indirect evidence in support of retaliation claim); *Booker v. Budget Rent-A-Car Sys.*, 17 F. Supp. 2d 735, 750 (M.D. Tenn. 1998) (same). Plaintiff here does not claim to have direct evidence of retaliation.

To prove a *prima facie* case of retaliation using indirect evidence, a plaintiff must show that (1) she engaged in activity protected under Title VII (or the THRA); (2) the defendant knew she exercised her protected civil rights; (3) the defendant took an employment action adverse to the plaintiff; and (4) there was a causal link between the protected activity and the adverse employment action. *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 929 (6th Cir. 1999). If the plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the action taken. If the defendant meets that burden, the burden then shifts back to the plaintiff to demonstrate that the defendant's proffered reason is pretextual because it (1) had no basis in fact; (2) did not actually motivate the decision; or (3) was insufficient to motivate the decision. *Sherrills v. Beison*, No. 06-2351, 2007 WL 2171314, at *3 (6th Cir. July 27, 2007).

Vanderbilt asserts that it is entitled to summary judgment on Plaintiff's retaliation claim because she cannot establish that she suffered an adverse employment action, that any alleged adverse action was causally related to her engaging in protected activity, or that Vanderbilt's proffered non-retaliatory reasons for any actions it took were pretextual.

### *(2)* *Whether Plaintiff Was Subject to an Adverse Employment Action*

The Supreme Court has stated that the standard for proving an adverse employment action in the retaliation context is not as high as the standard applied in the disparate-treatment context. *Burlington N.*

& *Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2414–16 (2006). In *White*, the Court held that to prove retaliation "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). The reference to a "reasonable employee" establishes "an objective standard" that is "judicially administrable," and the "materiality" requirement excludes complaints based on "trivial harms." *Id.* The Court also recognized that "the significance of any given act of retaliation will often depend on the particular circumstances. Context matters." *Id.* Thus:

> A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination. Hence, a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an act that would be immaterial in some situations is material in others.

*Id.* at 2415–16 (quotation marks and internal citations omitted).

Plaintiff alleges that Vanderbilt retaliated against her by (1) conducting a biased investigation into her report of sexual harassment; (2) denying her access to her office; (3) suspending her from working on the AMPT Grant; and (4) acquiescing in Dr. Kessler's refusal to support her own grant proposals to the extent Plaintiff believes he should have, or to include her on his own grant proposals submitted after June 2005.

First, regarding Plaintiff's claim that the OED's investigation was biased, the evidence to support such a claim consists solely of Plaintiff's own conclusory and unsupported allegations. The portions of the record to which Plaintiff cites simply to do not support her claims.[4] Moreover, Plaintiff cannot and has not alleged that she suffered any adverse employment action resulting from the allegedly biased investigation.

With respect to Plaintiff's allegation that she was denied access to her office, even assuming that that Plaintiff has presented sufficient evidence that Vanderbilt in fact denied her access to her office

---

[4]Even assuming, as we must at this stage in the proceedings, that Plaintiff's version of events is the true and correct one, the Court cannot say that Vanderbilt's decisions resulting from the OED investigation and the independent faculty committee's recommendations, based on essentially the same allegations as those presented here, were unreasonable.

immediately after the June 29, 2005 meeting, there is no dispute that Plaintiff left Nashville the next day on a previously planned trip, and that when she returned to Vanderbilt around August 20 she had full access to her office. In other words, at most, Plaintiff lacked access to her office for one or two days. As such, any lack of access was temporary and obviously resulted from Vanderbilt's concern that she not inadvertently come into contact with Kessler. The Court finds that any such temporary denial of access to her office, even considered in conjunction with Plaintiff's other allegations of retaliatory action, was not sufficiently material to constitute an actionable adverse employment action.

With respect to Plaintiff's allegation that she was suspended from working on the AMPT Grant, she does not dispute that Kessler was likewise suspended from working on the grant and that a substantial reason for the length of the suspension had to do with the unavailability of [18F]fallypride. However, Plaintiff has also alleged that up until the meeting on June 29, work on the AMPT Grant constituted 90% of the work she conducted at Vanderbilt, and that being required to cease work on the Grant during the fall of 2005 left her with essentially no job duties. The Court therefore finds that for purposes of establishing her *prima facie* case of retaliation, Plaintiff has raised a question of fact as to whether suspension of the grant constituted a materially adverse change in the terms and conditions of her employment. *White*, 126 S. Ct. at 2410.

Plaintiff also alleges that she has not received the support she needed and reasonably expected in obtaining grant funding, and that as a result she has not achieved 75% funding of her salary through outside sources within the three-year time frame set forth when she was first employed by Vanderbilt. Although Vanderbilt argues that the terms, conditions and benefits of Plaintiff's employment have not changed, there is no dispute that Plaintiff's one-year contract, which expired in July 2007, was not renewed for a full year as it had been in the past. Instead, Plaintiff received a six-month contract renewal, essentially a grace period during which to attempt to secure funding. A jury might well infer under the circumstances that Vanderbilt chose to extend her contract despite her lack of funding in order to avoid the more blatantly adverse employment action of an outright non-renewal of her contract. The Court therefore finds that the university's alleged failure to support Plaintiff's grant-writing or to ensure her inclusion on other, more senior faculty member's grants may have had a bearing on her opportunities for professional development and career advancement and therefore "might have dissuaded a reasonable

worker from making or supporting a charge of discrimination," *White*, 126 S. Ct. at 2415 (2006); *cf. Nakis v. Potter*, 422 F. Supp. 2d 398, 420 (S.D. N.Y. 2006) (holding that a supervisor's denial of Postal Service employee's request to retake a computer software class was an adverse employment action as the employee's request had bearing on her professional development and promotional opportunities); *Santa Cruz v. Snow*, 402 F. Supp. 2d 113, 127 (D.D.C. 2005) (noting that the denial of a training opportunity on allegedly discriminatory grounds can constitute an "adverse employment action" if the denial materially affects the employee's promotional opportunities). Since the Court must construe the facts and make all inferences in Plaintiff's favor for purposes of this summary judgment motion, the Court finds that Plaintiff has established a jury question as to whether she was subject to an adverse employment action sufficient to support a retaliation claim, based generally on Kessler's and Vanderbilt's alleged failure to support her grant work. Whether Plaintiff has presented sufficient evidence that the Defendants actually failed to support her specific grant-writing efforts, as discussed below, is a different question.

### (3) Whether the Alleged Adverse Actions Were Causally Related to Plaintiff's Protected Activity

In order to show a causal connection, a plaintiff must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action. *EEOC v. Avery Dennison Corp.,* 104 F.3d 858, 861 (6th Cir. 1997). Although no one factor is dispositive in establishing a causal connection, evidence that the defendant treated the plaintiff differently from identically situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation. *See Moon v. Transport Drivers, Inc.,* 836 F.2d 226, 229–30 (6th Cir. 1987). The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met. *Avery,* 104 F.3d at 861.

With respect to the suspension of work on the AMPT Grant, there is certainly an immediate temporal connection between Plaintiff's report of sexual harassment and Sandler's decision in that regard. Although the Sixth Circuit has recognized that "in certain distinct cases" temporal proximity alone may constitute indirect proof of causation, *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004), the Court finds that the temporal proximity in this case, under the particular circumstances presented, is not sufficient to establish causation. Alternatively, even if we consider the temporal proximity alone to give rise to an inference of causation, Plaintiff cannot rebut Vanderbilt's proffered legitimate, non-retaliatory

reason for its action. Specifically, Vanderbilt asserts that the decision to suspend work on the AMPT Grant was not retaliatory but resulted from Vanderbilt's concern with making sure Plaintiff did not have to come into any direct contact with Kessler. Work on the Grant could not continue without Kessler, because he was the Principal Investigator on the Grant and the only person authorized to administer [18F]fallypride. For that reason, to be fair, Vanderbilt suspended work on the Grant altogether, for both Kessler and Plaintiff. Meanwhile, it is undisputed that the fallypride needed to conduct scans for the AMPT Grant became temporarily unavailable, so work on the grant would have come to a stop anyway. When fallypride again became available in early 2006, Plaintiff and Kessler both went back to work on the Grant, communicating with each other via e-mail through an intermediary or by copying both their attorneys on all their communications.

Plaintiff asserts that she could have conducted work on the grant that would not have required her to work directly with Kessler and would not have involved scanning patients or the use of fallypride. The Court finds that her statement in that regard is totally conclusory and does not rebut Vanderbilt's proffered reason for temporarily suspending work on the Grant. Plaintiff's claim of retaliation based on suspension of work on the AMPT Grant therefore is not tenable.

With respect to the Plaintiff's own grant proposals on which she alleges she received insufficient support from Kessler specifically and Vanderbilt generally, the Court finds that Plaintiff has presented evidence that, viewed in the light most favorable to Plaintiff, may be considered to give rise to an inference of a causal connection. The alleged lack of support for Plaintiff's grants and Kessler's failure to include her on his own grants all occurred within the two years following Plaintiff's initial report of harassment. Because the OED's investigation into Plaintiff's allegations took nearly six months, and Vanderbilt took another six or seven months to determine whether disciplinary action was warranted, Plaintiff's report had on-going repercussions for Kessler. In addition, Plaintiff alleges that prior to her making a report of harassment, Kessler went out of way promptly to assist her with her grant proposals, and included her as a co-investigator on all of his grant proposals that involved PET technology. She alleges this changed after her report. Considering all of the factors together, the Court finds that Plaintiff has created an issue of fact as to whether the allegedly diminished support for her grant activities was causally related to her harassment report.

### (4)    Vanderbilt's Non-Discriminatory Reasons for Its Actions and Whether Plaintiff Has Presented Evidence of Pretext

As discussed above, the Court finds that Plaintiff has not presented sufficient evidence to support a *prima facie* case of retaliation based upon the allegedly biased investigation into her report of sexual harassment, the denial of access to her office or the suspension of work on the AMPT Grant. With respect to her allegations that the Defendants retaliated against her by failing to support her grant-writing efforts or to include her on Kessler's grant proposals submitted after June 2005, however, there are disputed issues of fact as to each of the elements of her *prima facie case.* The Court will therefore consider the evidence relevant to each of the six different grant proposals Plaintiff has submitted and the three grant proposals Kessler has submitted since June 2005, to determine whether Defendants have proffered legitimate, non-retaliatory reasons for their actions and whether Plaintiff has provided evidence that such reasons are pretextual.[5]

(a)    Plaintiff's Sex Differences Grant Proposals

Plaintiff's "Sex Differences Grant" proposal was the first grant proposal she ever submitted and she submitted it three times without its ever being accepted for funding. She submitted it the first time to the Mental Health Institute in January or February 2005 with Kessler named as co-investigator. After the proposal was rejected, she prepared to re-submit it on November 1, 2005 and asked Drs. Patton and Sandler on October 24, 2005 for permission to name Kessler as co-investigator and to obtain his assistance with preparing the proposal, and also requested assistance with statistical analysis to support it. Patton and Sandler agreed to speak to Kessler and to contact the Biostatistics Department that same day. Kessler, when approached with Plaintiff's request for his assistance, agreed to be co-investigator on the grant, but because he was scheduled to leave town the next day, he was not able to review the grant proposal or to help Plaintiff address some of the reasons the grant was not accepted for funding in the first place. He did, however, write and sign a letter of support indicating his participation as co-investigator, and he recommended someone in the statistics department at Vanderbilt from whom Plaintiff might be able to obtain assistance. Sandler and Patton contacted the Biostatistics Department to request

---

[5]In her Complaint, Plaintiff also alleged that Kessler removed her as co-investigator from grant proposals he resubmitted after June 2005. Kessler has testified that he did not resubmit any grant proposals after June 2005 that he previously submitted prior to that date. Plaintiff has not offered any evidence to the contrary.

assistance for Plaintiff, but, according to Plaintiff, she was ultimately told there was no one who could help her given the short notice and the November 1 submission date.

In other words, the Defendants have presented evidence that they tried to help but were unable to provide as much assistance as Plaintiff wanted given the short notice and the fact that Kessler had a previously scheduled trip. Plaintiff has not come forward with any evidence to rebut the Defendants' non-discriminatory reasons for not doing more. Plaintiff's retaliation claim based upon any of the Defendants' alleged failure to offer greater assistance with the first resubmission of the Sex Differences Grant therefore fails.

Plaintiff resubmitted the Sex-Differences Grant proposal again, this time to the NIH, in October 2006. Kessler again agreed to serve as co-investigator on the grant. Plaintiff alleges, however, that "his comments were not meaningful and were provided at the last minute so that it was impossible for Plaintiff to incorporate any of his suggestions into the proposal." (Doc. No. 107, at 34.) Plaintiff's allegations in that regard are simply not supported by the record. She provided Kessler with the grant paperwork for him to review on Friday afternoon, September 29, 2006 which, she claims, was sufficient time for him to review it and provide comments before the Monday, October 2 submission deadline. She also asserts that, prior to June 2005, Kessler always reviewed her work immediately. When Kessler had not gotten back to her by Sunday afternoon, she called Joann Fields, Grant Review Analyst for the Radiology Department, who called Kessler around 3:00 p.m. and asked him why he had not sent his comments to Plaintiff. He responded that he had not yet had a chance to look at the grant as he had a lot going on, but that he would do so immediately and send his comments. An hour and a half later, he sent Plaintiff a lengthy e-mail with comments, suggestions and encouragement, but Plaintiff apparently did not incorporate any of his suggestions into the final grant application before submitting it the next day.

Regardless, Plaintiff's contention that Kessler's comments were insufficient and came too late to be helpful is conclusory and unsupported and is not sufficient to create a jury question as to whether Kessler's participation was inadequate, even if considered in light of the other evidence in the record. The simple and undisputed facts are that Kessler agreed to be co-investigator on the grant, and he reviewed the proposal and provided thoughtful comments within 48 hours of being requested to do so. Plaintiff received his comments prior to the submission date of the grant. Plaintiff has not shown that

Kessler's failure *immediately* to review and provide comments on this grant was retaliatory in any way, or that his proffered non-discriminatory reason for not getting to it quicker—that he had not had time—was pretextual.[6]    Plaintiff's retaliation claim based upon Defendants' alleged failure to provide greater assistance with this grant also fails.

(b)    <u>Plaintiff's Borderline Personality Grant Application</u>

Plaintiff alleges that, in February 2006, she submitted a grant proposal to the NIH entitled "Imaging of Dopamine Release in Borderline Personality Disorder" (the "BPD Grant").  (Riccardi Aff. ¶ 66.) She claims that Kessler refused to assist her with this grant in any way, despite having agreed in March 2005 to serve as co-investigator on the grant proposal, that Vanderbilt acquiesced to his refusal and that his refusal was retaliatory.

The evidence, viewed in the light most favorable to the Plaintiff, shows that she prepared the paperwork for this grant and was ready to submit it in June 2005, but decided for strategic reasons to wait until early 2006 to submit it.   Kessler was listed as co-investigator on the application; he reviewed the draft proposal in March or April 2005 and provided comments and suggestions at that time and even offered to allocate money from his other grants to fund two or three scans so that Plaintiff would have pilot data to support the BPD Grant proposal.   (Riccardi Aff. ¶¶ 67, 68, and Ex. 5.)   Plaintiff does not allege, however, that Kessler saw the final version of the application.   Kessler asserts that he did not, and further claims that his agreement to assist with the grant in early 2005 was preliminary and anticipated his involvement in developing procedures for the study.

In a letter to Vanderbilt's counsel dated September 26, 2005, Plaintiff's counsel at that time, David Raybin, stated:  "With regard to the new grant [presumably referring to the BPD Grant proposal] Dr. Riccardi finds it satisfactory that Kessler's name would be on the proposal so as to enhance its chance of being accepted.   However, there must be a clear understanding that if it is accepted and funded, he would be replaced as the person with whom she would work . . . ."  (Doc. No. 74-16, at 24.)

In January 2006, Plaintiff asked Kessler to sign the BPD Grant proposal as a co-investigator but she did not contact him directly or give him a complete copy of the submission.   Instead, she apparently gave paperwork to Kessler's secretary who then asked him to sign it.   Kessler notified Plaintiff's attorney

---

[6]Plaintiff has also not shown that Kessler's failure to respond more quickly constituted a *materially* adverse employment action.

through his own attorney that he was not willing to act as co-investigator on the grant. In a declaration filed in support of his motion for partial summary judgment, Kessler states that, as he understood the project, the administration of medication could cause exacerbation of patients' underlying symptoms. This risk could be minimized by the use of appropriate research procedures, but Kessler claims he had no information regarding what procedures Plaintiff planned to put in place to minimize this risk. He asserts he was also concerned that the safety of patients could be jeopardized by Plaintiff's refusal to contact him directly if emergencies arose during the course of the research. Kessler also asserts that ethical rules require that researchers who sign grants understand their research commitments and the essential aspects of the research project involved and that, without further information about Plaintiff's proposed procedures on this grant, he did not feel he could satisfy his ethical obligations. Finally, Kessler claims that he was not the only person at Vanderbilt who could co-sign the grant proposal, and that the proposal was ultimately submitted by Plaintiff with a different co-investigator.

In response, Plaintiff asserts only that she never "refused" to provide a copy of the complete grant paperwork to Kessler, but she does not contend that she provided him with a complete copy of the proposal, nor has she rebutted or called into question any of Kessler's asserted reasons for refusing to sign the grant as a co-investigator. She faults Vanderbilt for acquiescing in Kessler's refusal to join in this grant proposal and for not offering her the assistance of "an alternative faculty member with relevant expertise to serve as co-investigator on the grant," but also states that Kessler was the only Vanderbilt faculty member to possess such relevant expertise. (Doc. No. 93, Riccardi Aff. ¶¶ 70, 71.) Regardless, when Sandler learned that Kessler did not feel comfortable being co-investigator on the BPD Grant proposal, he suggested to Plaintiff that another faculty member could serve as co-investigator, and the University would designate another faculty member to be an authorized user of the radioactive drugs to be used in connection with the imaging associated with the grant application. (Sandler Aff. ¶ 31 and Ex. 11.)

Sandler also testified that the reasons he did not instruct or direct Kessler to participate in Riccardi's grant application included (1) his concerns that Kessler and Plaintiff could not meaningfully collaborate on a project such as this one given Riccardi's repeated statements, both directly and through her attorney, regarding her refusal to have any direct contact with Kessler; and (2) principles of academic

freedom inherent in any University community, and set forth in the Faculty Manual, rendered it inappropriate for him to attempt to dictate to Kessler to join in a specific project. (*See* Sandler Aff. ¶ 32.)

The Court finds that, assuming for purposes of this motion that Plaintiff has established a *prima facie* case based on Kessler's refusal to support this grant and Vanderbilt's and Sandler's acquiescence in that decision, the Defendants have presented legitimate, non-discriminatory reasons for the action, which Plaintiff has failed to address. She has not pointed to any evidence that creates a disputed issue of fact as to whether Kessler's reasons for refusing to be co-investigator on her BPD Grant were pretextual, and Plaintiff's attorney's admission that Plaintiff wanted Kessler named on the grant proposal but did not really intend to work with him on the project lends further support to Kessler's expressed ethical concerns. Plaintiff's retaliation claim based on Kessler's withdrawal of his support for the BPD Grant therefore fails.

(c)     Plaintiff's Autism Grant Proposals

In June 2006, Plaintiff submitted an NIH grant proposal on autism. Kessler made comments on the initial NIH grant and signed it as co-investigator. Plaintiff alleges that Kessler's comments were "not meaningful and comprised all of one page" (Riccardi Aff. ¶ 74), and that his failure to provide more extensive assistance was somehow retaliatory. The Court finds that the record shows that Kessler agreed to be co-investigator on the grant and provided substantive commentary on Plaintiff's draft proposal. Plaintiff's allegations that his comments were too short and not meaningful are conclusory and unsupported, and she has not demonstrated that she suffered a materially adverse employment action in connection with Kessler's assistance on this grant proposal.

In August 2006, Plaintiff submitted an internal Discovery Grant proposal, also on autism. She contends that Kessler failed to assist her with that grant application and that his refusal to do so was again retaliatory. With respect to this grant proposal, the undisputed evidence shows that Plaintiff initially requested that Kessler be co-investigator on an unspecified discovery grant on Friday, August 11, 2006; the request appeared as basically a postscript at the end of an e-mail discussing their work on the AMPT Grant. Plaintiff did not indicate the subject of the grant or the date on which she intended to submit the proposal. Rather, she simply stated, "I am apply to a discovery grant and I am requesting your willingness to be on the grant." (Doc. No. 82-2, at 4.) On Monday, August 14, Kessler responded to the e-mail, first commenting on the other matter being discussed and then adding, "In regard to the discovery

grant, I would like to know the topic of the grant and would like to be able to have a chance to make meaningful comments before its submission."  (*Id.*)

> In a response that can only be characterized as snippy, sent later the same day, Plaintiff asked,

> As long as your help for the discovery grant [sic], why do you want to know about the topic?  would this change you [sic] availability in terms of being an investigator?  You are the only one who does PET neuroimaging at Vanderbilt as you may well know.  Surely the only one I can ask.  I am not sure about what you mean by 'to make meaningful comments before its submission'.  Please explain.

(*Id.*)  She did not, however, answer Kessler's question as to what the topic of the grant was, nor did she indicate the date on which she planned to submit the proposal.

> The next day, August 15, Kessler replied:

> Regarding the Discovery Grant, when an investigator agrees to be a collaborator, she or he agrees to provide support and to be responsible for the scientific conduct of that grant.  In this regard it is much like a paper where one must sign a release stating that you accept responsibility for the content of the paper and have no conflict of interest.  I would very much like to help you with this grant and hope that you receive this funding.  The ethical conduct of research however requires that I know what I am pledging to support and what I am accepting responsibility for.  I [am] not trying to be difficult in this regard, but knowing the content of the grant applications on which you are a collaborator is a basic responsibility of each investigator.  I hope that this explains the basis of my previous comments to you.

(Doc. No. 82-2, at 2.)

> The following day, on Wednesday, August 16, 2006, Plaintiff responded with slightly greater civility:

> Regarding the Discovery Grant, I perfectly agree with you.
> Grant is on autism.  I requested your willingness to be on the grant on Friday, you answered on Monday and than [sic] – after one more day of (frantic) consultation – yesterday.
> Do you think you can give your consent today??

(*Id.*)  Again, however, she did not indicate when she intended to submit the grant proposal.

> The following morning, Thursday, August 17, Kessler responded that he would be pleased to assist with the grant and that he presumed it would be consistent with the NIH autism grant proposal previously submitted.  He also included some preliminary comments and suggestions and stated, "I would like to help in the composition and editing of this application so that, as much as possible, the grant application is clear and compelling."  (*Id.*)  An hour later, Plaintiff responded:  "Thanks but unfortunately it is too late; I had to submit the grant."  (Doc. No. 82-2, at 1.)  In other words, Plaintiff waited to request assistance until less than a week before she planned to submit the grant proposal, never told Kessler the

date on which she planned to submit the proposal, and then wasted several days quibbling about whether he really needed to know the grant's topic before agreeing to co-sign it.

In her response in opposition to summary judgment, Plaintiff claims that Kessler's response to her request that he assist with the Discovery Grant was disingenuous because, as her mentor, Kessler had "full knowledge of [Plaintiff's] grant work" and knew that she could only be referring either to the Autism Grant or Sex Differences Grant. In addition, Plaintiff claims Kessler was well aware of the submission dates for Vanderbilt Discovery Grants because there are set quarterly dates for submission of such grant proposals and he had submitted his own discovery grants. Finally, Plaintiff asserts that, prior to the filing of her formal complaint against him, Kessler would "immediately pledge his assistance to her with her grants even before she requested any help." (Riccardi Aff. ¶ 77.)

Plaintiff's position with regard to the Kessler's lack of assistance on the Autism Grant is beyond ridiculous. Her assertions that Kessler must have known the topic of the grant and its due date are conclusory and not based on personal knowledge. Her approach to soliciting his assistance was patently unreasonable: She never sent him the grant documents, never told him what her submission deadline was, and in any event did not request his assistance sufficiently in advance of her unspoken deadline for Kessler to have had time to provide meaningful assistance. Even assuming his failure to co-sign the Discovery Grant could be considered a materially adverse employment action, Plaintiff has not presented any evidence suggesting that such failure was causally related to her having made a discrimination claim against him, nor has she rebutted Kessler's proffered legitimate, non-discriminatory reason for that failure—namely, that he agreed to support the grant only to discover Plaintiff had already submitted it.

Plaintiff's retaliation claim based on Kessler's allegedly insufficient support of her Autism Grants therefore fails.

(d)     Plaintiff's NARSAD Grant Application

NARSAD is a non-profit organization that provides funding for scientific research in severe psychiatric brain and behavior disorders. (Doc. No. 82, Declaration of Robert M. Kessler ("Kessler Decl.") ¶ 18.) One of NARSAD's grant programs is for young investigators and requires that the applicants have an "on-site mentor or senior collaborator who is an established investigator. . . . The mentor/sponsor role is usually extensive for fellowship extension (mentor), and more senior colleague/advisor (sponsor) for an

applicant well prepared to initiate independent science."  (Kessler Decl. Ex. B (NARSAD application guidelines).)  Plaintiff wanted to submit a NARSAD Young Investigator grant proposal in July 2007, and first asked Kessler to sign her Young Investigator grant application as "senior author" in April 2007.

In his response to Plaintiff's e-mail request in that regard, Kessler stated:

> I have received your emails asking me to serve as your NARSAD Young Investigator Award Mentor/Sponsor.  I feel I must respectfully decline to attempt to serve in that capacity.  As you know, the NARSAD Young Investigator Award requires a "Mentor/Sponsor" and the NARSAD web site states that the Mentor/Sponsor must provide a letter which states the mentor's commitment to facilitate the research proposal.  As you refuse to communicate with me except by email, refuse to accept any documents that display my handwriting or signature, and given the obvious disdain shown toward me and the general adversarial approach taken by you, I do not see how I could effectively fulfill the duties required of a Mentor/Sponsor for this project.  Additionally, I believe that I would have to disclose this situation to NARSAD in a Mentor/Sponsor letter so that they could adequately evaluate whether or not I can fulfill the duties as required.  Given these circumstances, I suggest that you contact Dr. Jeremy Kaye, Chair, Department of Radiology, who can assist you in finding a suitable mentor for this application.

 (Doc. No. 93-10, at 2.)  Kessler also attested in his Declaration that prior to responding to Plaintiff's request he contacted a colleague who, like himself, was also a member of the NARSAD Scientific Counsel to determine whether he should or could be Plaintiff's Mentor/Sponsor given the strained relationship between them and their method of communicating.  Kessler's colleague advised him that he would be required to disclose to NARSAD the method of communication, and also told him that he believed that NARSAD would not fund a grant where the communications between the Mentor/Sponsor and investigator were so limited and restricted.  Based upon that information and his own concerns, Kessler alleges that he reasonably believed he could not fill the role of mentor and his agreeing to do so would cause the grant application to be rejected.  (Kessler Decl. ¶ 19.)

In her response, Plaintiff states only that she did not ask Kessler to be her "mentor" but her "senior collaborator," and that there was no one else at Vanderbilt with relevant PET neuroimaging experience to serve in that role.  Plaintiff also points out that the role of senior collaborator to a more established young investigator was less intensive than that of "mentor," that Kessler had agreed to co-sign other grant proposals, and that they continued to collaborate together on the AMPT Grant.  She does not, however, refute Kessler's evidence that the involvement of a mentor or senior collaborator on a NARSAD Young Investigator's grant is intended to be substantially more intensive than that of a co-investigator on other types of grants, nor has she addressed his averments that he felt obligated to

disclose to NARSAD their method of communication and that, given the strained and limited communications between them, he was concerned that if he sponsored the grant proposal it would not be funded.

The Court appreciates the difficult nature of the situation in which Plaintiff finds herself: The Court of course must presume at this stage in the proceedings that Plaintiff's allegations of sexual harassment and assault are true. Accordingly, under those circumstances it is understandable that Plaintiff would have reservations about working and collaborating with the alleged perpetrator of the harassment and assault, even when that person is the only person at Vanderbilt who does the type of research Plaintiff is interested in pursuing and therefore the only person capable of furthering her career. The fact remains that Kessler's concerns about being a mentor/sponsor to a NARSAD Young Investigator with whom communications pose a problem are likewise reasonable, and Plaintiff has not offered any evidence to suggest that Kessler's stated reasons for not agreeing to serve in the Mentor/Sponsor role for the NARSAD grant application were pretextual. Likewise, Plaintiff has likewise not shown that Vanderbilt failed in any duty to assist her. Her retaliation claim based upon the alleged lack of support for her NARSAD grant application therefore fails.

(e)     Kessler's Post-June 2005 Grant Proposals

Kessler submitted three grant proposals after June 2005 on which he did not include Plaintiff as a co-investigator: (1) the "Methamphetamine Grant" submitted to the NIH; (2) an internal Vanderbilt Discovery Grant on "Dopamine and Depression"; and (3) the "Risperidone Grant" submitted to Janssen, L.P. in April 2006. As set forth below, the Court finds that Plaintiff has alleged sufficient facts from which a jury might reasonably conclude that Kessler's motive in not including Plaintiff as a co-investigator on either the Methamphetamine Grant or the Risperidone Grant was retaliatory.

Methamphetamine Grant Proposal

Kessler concedes he did not include Plaintiff as a co-investigator on his Methamphetamine Grant proposal submitted in October 2005, the only grant he has submitted to NIH after June 2005. He denies that Plaintiff's exclusion from the grant proposal was retaliatory in any way. Kessler states in his declaration submitted in support of his own motion for partial summary judgment that he did not include Plaintiff in the project because the budget for the Methamphetamine Grant was small and did not allow for

the inclusion of investigators who, like Plaintiff, did not have experience in the area of drug abuse. (Kessler Decl. ¶ 21.)

Plaintiff, on the other hand, alleges that "she was named as a co-investigator on all of Dr. Kessler's grants submitted for funding since she began work at Vanderbilt" up until she filed her complaints against him. (Doc. No. 107, at 37; Riccardi Dep. at 309:15 – 311:11.) Further, she claims she was included on several grants for which she did not, at the time of the grant proposals, have any research experience or expertise in the area of the grant. (Riccardi Aff. ¶¶ 94, 95.) On that basis, she claims that it was not necessary for her to have experience in the particular study area to serve as a co-investigator on a grant involving PET imaging, since her function would have been to serve as a medical doctor performing neuroimaging analysis using PET, the same role she played for other grants on which she worked with Kessler. (Riccardi Aff. ¶ 97.) Plaintiff also points out that, while Kessler posits Plaintiff's lack of experience and expertise in the area of drug abuse as his non-discriminatory reason for not naming her as co-investigator, his grant application cites a research paper authored by Plaintiff. (*Id.*)

As to the size of the grant budget, Plaintiff claims that Kessler could have adjusted the grant budget in order to include another investigator on the grant. For instance, instead of allocating David Zald, PhD, an 8% effort with salary, he could have allocated only 5% to Dr. Zald as he had an earlier grant. (Riccardi Aff. ¶ 98.) He could also, she claims, have given her the opportunity to be listed on the grant without funding.

In reply, Kessler argues that Plaintiff has no personal knowledge about the requirements for a grant on which she had no involvement, and therefore that her protestations that experience and expertise in the area of drug abuse were not necessary are merely conclusory assertions that are not sufficient to give rise to a material issue of disputed fact. Kessler also points out that Plaintiff's claim that he could have manipulated the budget to include her is likewise not based upon personal knowledge, in addition to the fact that working on an unfunded grant would not have contributed to Plaintiff's salary or, therefore, her ability to stay at Vanderbilt. In sum, Kessler argues that Plaintiff has no admissible evidence to establish that his proffered reasons for not including her on the grant—that the small budget of the grant was not sufficient to include co-investigators who lacked the requisite experience and expertise—were not honestly held beliefs upon which he reasonably relied given the facts before him at

the time the decision was made.

The Court nonetheless finds that the Plaintiff has created a genuine issue of disputed fact as to whether Kessler's proffered reasons for not including her on the Methamphetamine Grant proposal were pretextual. There is a genuine issue of material fact as to whether Plaintiff had been included on all Kessler's NIH grant proposals involving PET after she arrived at Vanderbilt up until June 2005, regardless of her expertise and experience in the particular area of study. There is likewise a genuine issue of material fact as to whether Plaintiff reasonably expected to be included on all of Kessler's grants involving PET imaging. Clearly, the fact that Plaintiff refused to be in direct contact with Kessler after June 2005 certainly made working together more difficult. Notwithstanding, Plaintiff's reluctance in that regard must be considered reasonable at this juncture, since the Court must view the facts in the light most favorable to the Plaintiff. Moreover, the parties have been able to continue to work together on the AMPT Grant, so it must be assumed that they would have been able to work together in a similar fashion on other grants.

Kessler's Dopamine and Depression Grant Proposal

Kessler also submitted a small internal Vanderbilt Discovery Grant proposal in March 2006 on Dopamine and Discovery, on which he did not include Plaintiff as a co-investigator. Kessler alleges that this internal grant only permitted two investigators and required participation by two different departments. Plaintiff therefore was not even eligible for inclusion on this grant. (Kessler Decl. ¶ 23.) In his deposition, he stated he did not include Plaintiff because at the time of his submission collaboration with Plaintiff had been "exceptionally difficult." (Doc. No. 89-3, Deposition of Robert Kessler, M.D. ("Kessler Dep.") at 837:2–5.)

Plaintiff argues that Kessler's claim is "disingenuous" because the internal grant proposal did not request funding for any part of his or his co-investigator's salary in the budget, and that Internal Discovery Grants typically do not fund the salaries of the investigators because the grant money is allocated to the study itself instead. Plaintiff claims that the purpose of a Discovery Grant is "to obtain pilot data to then use as support for a larger grant submission where a portion of the investigators' salaries would be funded. (Riccardi Aff. ¶ 102.) She also claims she would have "gladly" participated on this grant even without funding.

Regardless, Kessler states he did not include any other investigators from the Radiology

department, so Plaintiff was not treated differently than any other Radiology Department members. Plaintiff has not refuted that fact, nor the contention that the internal grant only permitted two investigators and they each had to be from different departments. Plaintiff therefore has not succeeded in pointing to specific facts in the record that refute or create an issue of fact concerning the Kessler's legitimate, non-discriminatory reason for his failure to include her as a co-investigator on his Internal Discovery Grant.

Kessler's Risperidone Grant Proposal

In his deposition, Kessler discussed his Risperidone Grant proposal, submitted to Jansen, LP in April 2006. At his deposition, in response to the question as to why Plaintiff was not assisting him in the preparation of that proposal, Kessler stated that "it was far simpler just to write it, and her help was not needed." (Kessler Dep. at 838:19–20.) According to Plaintiff, Risperidone is an antipsychotic medication and the grant involved PET scanning of individuals diagnosed with schizophrenia. She alleges that the subject of the study is similar to the previous neuroimaging analysis work she and Dr. Kessler have done together. Further, although Kessler submitted the proposal without input from anyone else, he included Dr. Richard Shelton as a co-investigator on the grant, despite Dr. Shelton's alleged lack of expertise in schizophrenia or neuroimaging. These facts are sufficient to give rise to an inference that Kessler's stated reason for not including Plaintiff on the grant—that it was just too much trouble—was pretextual and that the true motive in excluding Plaintiff from this grant proposal was retaliatory.

### *(5)* **Issues of Fact Preclude Summary Judgment on Plaintiff's Retaliation Claim Against Vanderbilt**

In sum, Plaintiff lacks evidence to support her claim of retaliation based upon Vanderbilt's or Kessler's alleged lack of support for her own grant proposals. Notwithstanding, the Court finds that Plaintiff has presented sufficient evidence from which a reasonable jury might conclude that Kessler, in his capacity as Plaintiff's supervisor, retaliated against Plaintiff by refusing to include her as a co-investigator on his own Methamphetamine and Risperidone grant proposals. Because Kessler was in a supervisory position vis-à-vis the Plaintiff, his actions are imputed to Vanderbilt for purposes of Plaintiff's retaliation claim. *See Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405–06 (6th Cir. 1997) (noting that agents of the employer cannot be individually liable under Title VII, but that the "obvious purpose" of the use of the word "agent" in the statute was "to incorporate respondeat superior liability into the statute" (citations

omitted)).  Vanderbilt's motion for summary judgment as to the retaliation claim against it must therefore be denied.

**C.  Plaintiff's Retaliation Claim Against Kessler Individually Under the THRA**

As indicated above, the THRA makes it a discriminatory practice for any person to retaliate against another person "because such person has opposed a practice declared discriminatory by this chapter or because such person has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing under this chapter."  Tenn. Code Ann. § 4-21-301.  The THRA, unlike Title VII, permits retaliation claims against individual "persons" and not merely against employers.  *Emerson v. Oak Ridge Research, Inc.*, 187 S.W.3d 364, 377 (Tenn. Ct. App. 2005).

As discussed above, there is no question that Plaintiff engaged in protected activity, first when she reported sexual harassment to the ODC, and later when she filed a formal complaint with the EEOC. Kessler was aware of Plaintiff's exercise of protected rights.  He maintains, however, that the actions of which Plaintiff complains, even if true, do not constitute materially adverse employment actions sufficient to support a claim for retaliation under the THRA.   In addition, Kessler claims that Plaintiff cannot establish that he took any adverse employment action against her or that any such alleged action is causally related to the protected activity.   Finally, Kessler asserts that even if his actions could be considered adverse employment actions, he has proffered legitimate, non-discriminatory reasons therefor, which Plaintiff cannot rebut

As set forth above in connection with the discussion of the retaliation claim against Vanderbilt, the Court finds that Plaintiff has not presented sufficient evidence from which a jury could conclude that Kessler's alleged lack of support for Plaintiff's own grant proposals was retaliatory.  However, Kessler's motion for partial summary judgment on the retaliation claim against him must be denied for the same reasons Vanderbilt's motion as to that claim must be denied:  The actions upon which the claims against Vanderbilt are premised were all actions taken individually by Kessler, and Plaintiff has demonstrated the existence of material disputed facts as to whether Kessler's failure to include her on his own Methamphetamine and Risperidone Grant proposals was retaliatory.

**D.  Retaliation Claim Against Sandler Under the THRA**

Although she did not include an "aiding and abetting claim" in her Complaint, Plaintiff now alleges

that Sandler is subject to individual liability for retaliation under the "aiding and abetting" provision of the THRA. Specifically, the THRA makes it a discriminatory practice to "[a]id, abet, incite, compel or command a person to engage in any of the acts or practices declared discriminatory" by the THRA, including retaliation for engaging in activity protected by the THRA. Tenn. Code Ann. § 4-21-303(2). It is well settled law that individuals may be held liable for aiding and abetting an employer's discriminatory conduct by, for example, obstructing an investigation of the discrimination and thereby preventing corrective action from being taken. *See Rhea v. Schoonover*, 395 F. Supp. 2d 696, 706 (W.D. Tenn. 2005) (denying defendants' motion to dismiss, noting that an individual who instructs an employer to engage in a discriminatory practice will be held liable for this retaliatory act).

Plaintiff argues that Sandler is liable for aiding and abetting retaliatory conduct under the THRA because he "[knew] that [Vanderbilt's] conduct constituted a breach of duty and [gave] substantial assistance or encouragement to [Vanderbilt] in its discriminatory acts." (Doc. No. 107, at 62, citing *McNeail-Tunstall v. Marsh USA*, 307 F. Supp. 2d 955, 974 (W.D. Tenn. 2004)). More specifically, Plaintiff asserts that genuine issues of material fact exist as to whether Sandler interfered with and influenced the outcome of the ODC investigation in favor of Kessler; provided false information to Anita Jenious during the course of her investigation; barred Plaintiff from use of her office while allowing Kessler unfettered access to his office and the PET lab; and suspended work on the AMPT Grant.

The Court finds that Plaintiff has failed to produce any admissible evidence that could lead a reasonable jury to conclude that Sandler personally engaged in or aided and abetted any allegedly retaliatory conduct. First, Plaintiff has not pointed to admissible evidence demonstrating that Vanderbilt's ordinary practice is to suspend a faculty member accused of sexual harassment pending investigation, such that Sandler's decision not to do so in Kessler's place could be considered anomalous. As set forth above, Plaintiff's lack of access to her office was brief and did not constitute a material adverse employment action. To the extent Sandler's decision to suspend work on the AMPT Grant adversely affected Plaintiff, it is clear that it affected Kessler as well, and the action was done in an effort to prevent Plaintiff and Kessler from having any direct contact with each other during the immediate aftermath of Plaintiff's report of harassment. Ultimately, Vanderbilt worked out a system that permitted Plaintiff and Kessler to continue work on the grant without direct contact with each other.

Plaintiff also alleges that Sandler aided and abetted Kessler's retaliation when he acquiesced in Kessler's decisions not to be co-investigator on Plaintiff's BPD grant or to sponsor her NARSAD grant proposal. Even if Plaintiff's allegations in that regard were supported by admissible evidence, she has not rebutted Sandler's legitimate, non-discriminatory reason for not attempting to force Kessler to participate in these grants: that ethical principles pertaining to collaborative grant work and academic freedom prevented him from doing so.

Sandler's motion for summary judgment of the THRA retaliation claim against him individually will therefore be granted, and the cause of action against him dismissed.

## IV.  CONCLUSION

For the reasons set forth above, the Court finds that Vanderbilt's motion for summary judgment and Dr. Robert Kessler's motion for partial summary judgment must be denied. The motion for summary judgment of the retaliation claim against Dr. Martin Sandler will be granted.

An appropriate Order will enter.

_____
Thomas A. Wiseman, Jr.
Senior U.S. District Judge